IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No.   1:11-CR-246 (DNH) |
| | ) | |
| v. | ) | |
| | ) | |
| FRANK MORENO, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

GOVERNMENT'S MOTION FOR RECONSIDERATION OF THE COURT'S
DECISION TO DISMISS THE INDICTMENT

Pursuant to N.D.N.Y. Local R. 7.1(g), the government respectfully asks this Court to reconsider its decision to dismiss the indictment because it appears that the Court (1)  resolved factual disputes in the record by making credibility findings without the benefit of an evidentiary hearing; (2) improperly relied on its mistaken conclusion that the case was not complex in concluding that the delay in this case was "uncommonly long"; and (3) presumed prejudice where the defendant never articulated any tangible prejudice.  The government did not address these issues earlier because it was not aware that these issues would arise in the Court's decision.

I.      PROCEDURAL BACKGROUND

On January 10, 2014, the defendant moved to dismiss the indictment because his Sixth Amendment right to a speedy trial was violated.  On February 19, 2014, following oral argument on this issue, the Court granted the defendant's motion and dismissed the indictment with prejudice.

II.     THE COURT SHOULD RECONSIDER ITS DECISION TO DISMISS THE INDICTMENT.

A.      The Standard for Granting a Motion to Reconsider.

Reconsideration may be granted if the moving party "can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp. Inc.*, 70 F.3d 255, 257 (2d Cir. 1995); *see United States v. Desnoyers*, 2009 WL 2986664, at *1 (N.D.N.Y. September 14, 2009) (noting that a court may reconsider its previous ruling "to remedy a clear error of law or to prevent manifest injustice"); *see also United States v. Bayless*, 201 F.3d 116, 131 (2d Cir. 2000) (noting circuit conflict, but not deciding whether justification is required to reconsider suppression order).

## B.    The Record Contained Unresolved Factual Disputes, and the Court Credited Defense Assertions of Facts Without the Benefit of an Evidentiary Hearing.

The record, even as reflected in the Court's order, reflects unresolved factual disputes which the Court resolved by making credibility findings without the benefit of an evidentiary hearing. In addition, there are errors in the Court's factual findings. Based on these errors, this Court should reconsider its dismissal order and schedule an evidentiary hearing. Given the high stakes here—dismissal of the indictment means "that a defendant who may be guilty of a serious crime will go free, without having been tried," *Barker v. Wingo*, 407 U.S. 514, 522 (1972)—an evidentiary hearing is warranted.

Both parties had suggested that a hearing could be necessary, and the record demonstrated that there were factual disputes about important issues such as whether and when the defendant lived at the Scarsdale address. Under these circumstances, an evidentiary hearing was appropriate. *See United States v. Koskotas*, 888 F.2d 254, 256–58 (2d Cir. 1989) (per curiam) (vacating the district court's dismissal of the indictment and remanding "for a hearing on the likelihood of prejudice, as well as any other dispute issues arising under the test of *Barker v. Wingo*" where the district court had presumed that "lost material included exculpatory

2

evidence favorable to the defendant."); *United States v. Strunk*, 467 F.2d 969, 971 (7th Cir. 1972), *rev'd on other grounds*, 412 U.S. 434 (1973) (concluding that remand for an evidentiary hearing was not required, but "emphasiz[ing] that the better practice would be for the district court to conduct an evidentiary hearing upon a motion under Rule 48(b), and to make findings in ruling on the motion"); *cf. Tucker v. Wolff*, 581 F.2d 235, 238 (9th Cir. 1978) (remanding for an evidentiary hearing in a habeas corpus proceeding because the district court had not resolved factual issues; "Since there are unresolved factual questions, we remand the speedy-trial claim to the district court to conduct an evidentiary hearing and find the relevant facts. It should then carefully weigh all the criteria listed by [*Barker*] and determine whether the delay violated [the defendant]'s right to a speedy trial.").

For example, whether there was any reasonable expectation for the FBI to find the defendant at the Scarsdale address was an important issue, and there was an unresolved factual dispute about whether it was reasonable to assume that the defendant could be found there and whether he had lived there since the indictment had been returned. The Court found that the Scarsdale address was "a viable address,"[1] Order at 14. But the fact that the defendant had used the Scarsdale address at some point in the past did not support an inference that agents had concluded that he "might be found" there.

A review of the Court's order demonstrates that the government submitted substantial evidence that it was very unlikely the defendant would be found there: (1) in 2010 the DEA went to the Morrow Ave. address, and the defendant was not there, Order at 16; (2) on

_____

[1] Although the Court initially noted that the defendant's address was listed as "40 Mattow Ave. Apt 2R, Srarsdale, NY" in connection with a Westchester County term of probation stretching from June 25, 2008 through April 24, 2010, Order at 5, the Court later stated that the "40 Morrow Ave. address was associated with . . . a probation term in Westchester County, New York, ending as recently as April 24, 2010," Order at 16.

3

September 16, 2010, a cooperating defendant stated, according to the summary prepared by Special Agent Matthew G. Fontaine that "he believed Moreno had stopped using the 719 Beck Street location [in the Bronx] following a July 14, 2010, search of that address by law enforcement officials and Moreno was now living somewhere in Connecticut," Order at 19; (3) on May 26, 2011, "Team 31 visited the 719 Beck Street address on the day of the arrest operation and interviewed people who had seen Moreno there '*within days*,'" Order at 16–17 (emphasis added); (4) on June 14, 2012, a cooperating defendant stated that he believed that the defendant "had been living somewhere in Bronx, New York, as recently as June 2010," Order at 7; and (5) in September 2012, a cooperating source who "claimed to have purchased heroin from Moreno in the past, suggested Moreno was living on Randalls Avenue in Bronx, New York,"[2] Order at 7. The FBI therefore had reason to believe that the defendant was living in the Bronx, and that is where the defendant was arrested on September 9, 2013. Gov. Ex. D. In light of all of the demonstrated connections by the defendant to Bronx County, it was not unreasonable for law enforcement to have not done more investigation regarding 40 Morrow Avenue.

The Court rejected this evidence instead crediting the following assertions in the affidavit submitted by the defendant's sister: (1) that the defendant maintained 40 Morrow Avenue as his legal and mailing address for the past eight years, (2) that he shared that residence with his sister, Teresa Moreno, (3) that his sister had claimed the defendant as a dependent on her federally filed tax returns using his name and social security number for the 2010, 2011, and

---

[2] The government provided additional details not included in the Court's order. Specifically, the CS told Special Agent Fontaine that the defendant lived with "Fluffy" in the "middle project" on Randalls Avenue in Bronx, New York and provided a cellular phone number for "Fluffy." Ex. 14 to the Government's Opposition. *See also* Ex. A.

2012 tax years, and (4) that he was not aware of the federal indictment in the Northern District of New York before his December 2013 arrest.[3]  Order at 5, 14.

The representation that the defendant had lived with his sister for the past eight years was plainly questionable in light of the evidence that he was living in the Bronx and that he had not been at the Morrow Road address in 2010.  Moreover, the defendant's sister obviously is biased and has an interest in the outcome of this case.  The Court nevertheless credited her affidavit because it was supported by a complaint that the defendant had filed in Bronx Supreme Court and copies of tax returns she claims to have filed. Order at 6, 14.  But the civil complaint was not attached to the affidavit, probably because it does not have the 40 Morrow Ave, Scarsdale address.  Gov. Ex. B-1.  Instead the defendant used the address of 40 Marion Apartment 2RS, Scarsdale, New York 10583.  *Id.*; *see also* Gov. Ex. B (the law firm representing the defendant in the civil suit confirmed that he provided this address).  According to the tax rolls for Scarsdale, the Marion address does not exist.  Gov. Ex. B.

As for the tax returns attached to the affidavit, there was no evidence that they were actually filed.  They are not signed, and both the 2011 and 2012 returns have watermarks stating "DO NOT FILE."  Teresa Moreno Aff. Ex. A.  In addition, contrary to the Court's finding, the defendant's sister would not have needed the defendant's permission to claim him as a dependent, and even if she did, it would not establish that he actually lived with her.

---

[3] The Court concluded that "[t]here is no evidence that Moreno was aware of the federal indictment in the Northern District of New York prior to his unrelated arrest by the N.Y.P.D. during a traffic stop," Order at 14 (citing Teresa Aff. ¶¶ 6, 9-12; Breslin Aff. ¶¶ 12, 20).  At an evidentiary hearing, the government could have presented evidence that on September 6, 2012, Special Agent Fontaine spoke with a CS who had been arrested in February 2012 by the DEA in Virginia and that the CS told another agent that the defendant had been on the run from law enforcement.  Gov. Ex. A.

Moreover, the fundamental assertion in the Moreno affidavit—that the defendant lived with his sister—appears to be inaccurate based on additional evidence that could have been presented at an evidentiary hearing.[4] As reflected in the attached affidavit from Special Agent Peter A. Casson, neither the rental property's security guard officer nor its maintenance technician corroborates Teresa Moreno's assertions. The maintenance technician stated that he had not observed the defendant visiting his sister's apartment in at least four years; the security officer did not recognize the defendant as someone who had ever lived in the apartment complex. Gov. Ex. C. The security officer did, however, recognize the defendant's photograph because federal agents had interviewed him approximately two years earlier when they were trying to locate the defendant. *Id.*

In contrast to the Court's crediting of Teresa Moreno's affidavit, the Court did not credit the government's representations. For example, in connection with the government's representation that the FBI followed up on information from a June 14, 2012 proffer by contacting Con Edison to try to locate utility bills in the defendant's name, the Court stated that the government "has not provided any evidentiary support for this contention." Order at 7.

Similarly, in connection with the government's representation that the "FBI subpoenaed cell phone records and obtained a 'Trap and Trace Order' on [the] telephone number" identified as the defendant's roommate by the defendant's accomplice arrested in Virginia, the Court

---

[4] Although pretrial services reports are confidential, 18 U.S.C. § 3153; N.D.N.Y. Local R. 46.1, and the government would not normally reference such a report, counsel for the defendant relied on a favorable statement his client made during a September 11, 2013 pretrial services interview. *See* Breslin Aff. ¶ 16 ("in a Pretrial Services interview conducted on September 11, 2013, Mr. Moreno stated that he was not on the run, but instead was never made aware that there was a warrant for his arrest."). Because there is additional relevant information in that report, under the general principles of equity and completeness, the government has provided the Court with a copy under seal and respectfully requests that the Court review the highlighted portions of the report.

stated that the government "has not provided any evidentiary support for this contention." Order at 7–8; *see id.* at 20–21 ("The Government asserts that it subpoenaed cell phone records and a 'Trap and Trace Order' on this number, but has not provided any evidentiary support for this contention."). It is unclear why the Court would not credit this representation while crediting representations made by defense counsel (such as his assertions regarding prejudice). If the Court had held an evidentiary hearing, it would have revealed that the FBI (1) issued an administrative subpoena for the account information and call detail records for the phone number; (2) obtained an order authorizing the disclosure of the historical cell site information in an attempt to find out where the telephone was being used thereby finding out where the defendant and his roommate lived; and (3) reviewed the cell cite information which failed to identify a common location where the cell phone could be considered at "home" to try and pinpoint a residence for "Fluffy." Gov. Ex. A.

The inconsistencies in the record warranted an evidentiary hearing. Such a hearing would have allowed the Court to evaluate the credibility of the witnesses by observing their demeanor and learning about the context of their key assertions. Given the high stakes here, the Court should have allowed the government to present its evidence rather than crediting the defense allegations without testing those allegations during an evidentiary hearing.

**B.    The Court Improperly Relied on Its Mistaken Conclusion That the Case Was Not Complex in Concluding that the Delay in this Pre-Arrest Case Was "Uncommonly Long."**

Relying on a finding that this case is not complex (a finding that the government disputes), the Court accepted the defendant's argument that the delay here was "uncommonly long." Order at 9, 12. Although the complexity of the case is a factor in cases involving post-

arrest delay, it is not a factor in cases like this one involving pre-arrest delay. It therefore should not have been a factor in the Court's decision.

The "uncommonly long" term originated in *Doggett v. United States*, 505 U.S. 647 (1992), which involved "whether the delay of 8 1/2 years between . . . indictment and arrest violated [the defendant's] Sixth Amendment right to a speedy trial." *Id.* at 647. After observing that the Speedy Trial Clause "is written with such breadth that, taken literally, it would forbid the government to delay the trial of an 'accused' for any reason at all[,]" the Court stated that its cases had "qualified the literal sweep of the provision by specifically recognizing the relevance of four separate enquires: whether delay before trial was *uncommonly long* . . . ." *Id.* at 651 (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)) (emphasis added).

In using the term "uncommonly long," the *Doggett* court cited to this portion of *Barker*:

> The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case. To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge.

*Barker*, 407 U.S. at 530–31.

Although the *Barker* test is used for both pre-arrest and post-arrest delays, the complexity of the case factor is plainly relevant only to post-arrest delays. There the complexity of the case affects, among other factors, how long the defense needs to prepare for trial and therefore affects how long of a delay before trial is reasonable. That factor is irrelevant in the length of pre-arrest delay. The Court's reliance on *United States v. Cain*, 671 F.3d 271, 296 (2d Cir. 2012), Order at 12, was therefore misplaced because *Cain* involved post-arrest delays, not pre-arrest delays.

### C.   The Court Improperly Concluded that the Defendant Had Shown Sufficient Prejudice.

When analyzing the prejudice factor, the Court concluded that the defendant could "only seriously argue . . . the extent to which his defense will be impaired." Order at 24. The Court then relied on the assertion made by counsel for the defendant that he "could have addressed, could have remembered, and justified" the phone calls if he had been arrested earlier. Order at 25. Counsel's assertion, and therefore the Court's finding, fall short of what is required.

"A mere 'possibility of prejudice is not sufficient' to tilt the fourth *Wingo* factor in the defendant's favor." *United States v. Koskotas*, 888 F.2d 254, 257 (2d Cir. 1989). As the Second Circuit has observed:

> During periods of delay, even brief delay, evidence can be lost-sometimes without fault on the part of the prosecutor. Documents may be lost; potential witnesses may die, move away, or lose their memory of important events. When such a loss occurs there is no basis either in logic or precedent for assuming that the lost evidence would necessarily have been exculpatory.

*Id.* In *Koskotas*, the New York State Department of Labor had destroyed files, but copies of those files and notes and reports of those files were available to the defendant. The Second Circuit remanded for an evidentiary hearing and provided this guidance about what showing would be required on likelihood of prejudice for the defendant to prevail:

> There is no firm standard applicable to all cases. Each of the four *Wingo* factors varies in relation to the others. "We regard none of the four factors identified above as either a necessary or sufficient condition. . . . They are related factors and must be considered together. . . ." *Wingo*, 407 U.S. at 533. Thus in a case in which other factors firmly favor the government, *i.e.*, relatively short delay, faultless conduct by the government, and absence of effort by the defendant to push his case to an earlier trial despite the opportunity to do so, the defendant would be obliged to make a powerful showing as to both the likelihood and severity of prejudice.
>
> On the other hand, the more the other factors favored the defendant, the less would be required of him. Thus, at the other extreme, if the delay were egregious, the defendant had made efforts to secure a prompt trial and the government had delayed trial through negligence or laziness, exhibiting disregard for defendant's rights, a far lesser showing would be required. Indeed, on sufficiently egregious

9

facts, it is questionable whether the defendant need make any showing of prejudice in view of the Supreme Court's assertion that "none of the four factors . . . [is] a necessary . . . condition." *Wingo*, 407 U.S. at 533.

*Id.*

Here there was no showing of negligence, laziness, disregard for the defendant's rights, or egregious delay. In addition, there is evidence that the defendant knew about the indictment and used a false address on a civil complaint to avoid being found. Under these circumstances, a substantial showing of prejudice was required. The defendant did not meet that burden. In fact, he did not show any prejudice at all. He did not identify a single witness who was no longer available. He did not identify any evidence that had been lost. He relied only on his counsel's speculative statement that his memory had faded and did not support with an affidavit. Even if he had submitted an affidavit, given the straight-forward nature of the recorded conversations in this case,[5] his conclusory argument that his defense would be impaired because of his faded memory fell far short of what was required.

### Conclusion

For all of these reasons, the government respectfully requests that the Court reconsider its decision to dismiss the indictment and schedule an evidentiary hearing to resolve the factual disputes in the record.

---

[5] This Court noted that the defendant "was charged in only one count of a nine-count indictment," Order at 12, and that the defendant "emphasizes that the factual predicate for the conspiracy charge against him is a series of extremely brief telephone calls between Moreno and an unindicted co-conspirator named 'Reese Wilbur' totaling less than thirty minutes in length." Order at 25.

Respectfully Submitted,

RICHARD S. HARTUNIAN
United States Attorney


By:   /s/
Robert A. Sharpe
Assistant United States Attorney
Bar Roll No. 302573